**PADDOCK et al. v. SIEMONEIT et al.**

No. 14949.

Court of Civil Appeals of Texas.
Fort Worth.

Oct. 15, 1948.

Rehearing Denied Nov. 12, 1948.

Melvin F. Adler, of Fort Worth, for appellant, Burton B. Paddock, trustee in bankruptcy.

Van Zandt Smith and Ernest May, both of Fort Worth, for appellees (appellants) C. J. Siemoneit and Lelia Mae Siemoneit.

Theron Lamar Caudle, Andrew D. Sharpe and Frank K. Foster, all of Washington, D. C., and Frank B. Potter and A. W. Christian, both of Fort Worth, for appellee (intervener) United States.

McDONALD, Chief Justice.

This suit involves two principal controversies, which will be discussed separately, relating to the affairs of Siemoneit Drilling Co., Inc., which is now in bankruptcy.

The corporation in question was organized under the laws of Delaware in 1941, and shortly thereafter was granted a permit to do business in Texas. It was engaged in the business of drilling oil wells. C. J. Siemoneit held 6,000 shares of the outstanding capital stock, his son J. Robert Siemoneit held 500 shares, and E. R. Land, an employee of the company, held 480

shares. C. J. Siemoneit held an option to purchase the 480 shares from Land on terms not necessary to describe here. Throughout the life of the company C. J. Siemoneit was the president and managing officer of the company, and without doubt dominated its affairs.

Siemoneit did not carry a personal bank account, but paid his personal living expenses, bought certain property, and met other items of expense not connected with the company business, by issuing checks drawn on the company bank account, charging himself therewith in an account carried on the books of the company. Such account was credited from time to time with salary payments due Siemoneit, with amounts of expenses incurred by him for the benefit of the company, and with payments of cash made from him to the company. The total of such charges against Siemoneit from 1941 until the early part of 1945 was something over $70,000, and the total of credits in his favor on such account was about $40,000. At the time the company went into bankruptcy in 1946 Siemoneit owed the company about $30,000.

In July of 1941 Siemoneit purchased a residence in Fort Worth, which is referred to by the parties as the Rivercrest property. He paid $5,000 as a down payment, and executed a vendor's lien note for $12,500 for the remainder of the purchase price. It is conceded that the company at that time owed Siemoneit more than $5,000, and it is not claimed that any wrong was committed by him in giving a company check for $5,000 to cover the down payment. It is claimed, however, that thereafter Siemoneit used something over $14,000 of company funds in improving, caring for, and paying indebtedness against the property. In 1946 Siemoneit sold the Rivercrest property and used most of the proceeds of sale to purchase three tracts of land in Tarrant County. Plaintiff, the trustee in bankruptcy of the company, seeks in this suit to impose a constructive trust on the last mentioned tracts of land on the theory that Siemoneit wrongfully used company funds in the purchase of the Rivercrest property, which property was in effect converted into the three tracts purchased in 1946.

■ The trial court, without a jury, rendered judgment in favor of Siemoneit, adjudging that the trustee take nothing. He filed no separate findings of fact or conclusions of law, and none was requested. Therefore, on appeal, we are required to view the evidence in the light most favorable to the judgment of the trial court.

It is undisputed that the withdrawals by Siemoneit, from and after the end of July, 1941, until the company went into bankruptcy, greatly exceeded the credits allowed him on said account. The debit balance against him ran as high as $9,000 in 1941, as high as $34,000 in 1942, as high as $52,000 at one time in 1943, and as high as $39,000 in 1944. The balance owing by Siemoneit to the company was never under $10,000 from the beginning of 1942, and never under $28,000 from the beginning of 1943 until the company went into bankruptcy, when, as we have said, he owed the company about $30,000.

The company was indebted to creditors from the beginning, and when it went into bankruptcy it owed more than $236,000. A balance sheet in the record dated October 31, 1942, showed total assets of $363,000 and total liabilities, not counting the capital stock as a liability, of $296,000. The income tax returns of the company showed a loss for every year except 1942, for which year there was shown a profit of $1600. A loss of $50,000 was shown for 1941.

■ The relation of a corporate officer to the corporation has been described as being fiduciary, or quasi-fiduciary, requiring him to act loyally and in good faith, without assuming any position in conflict with the interests of the corporation. Managing officers are in a sense trustees, or quasi-trustees, and are strictly accountable for their breaches of trust. 19 C.J.S., Corporations, § 761, page 107. To the same effect see 13 Am.Jur. 948; 3 Hildebrand, Texas Corporations, page 1. The general rule is that an officer of a corporation who wrongfully or fraudulently uses corporate funds to purchase property in his own name may be held as a constructive trustee for the corporation. The rule is

654

well stated by the authors of an annotation appearing in 43 A.L.R. 1415, 1425:

"An officer of a corporation who fraudulently and wrongfully uses corporate funds to purchase real estate for his own benefit, and in his own name, will be declared a trustee ex maleficio of the property for the benefit of the corporation; and he will hold nothing except the naked title for the benefit of the cestui que trust, which may come into equity and compel a conveyance of the legal title."

This is a specific application of the general rule recognized in countless decisions and thus stated in Pomeroy's Equity Jurisprudence, 5th Ed., Vol. IV, page 105:

"Whenever a trustee or other person in a fiduciary capacity, acting apparently within the scope of his powers,—that is, having authority to do what he does,— purchases property with trust funds and takes the title thereto in his own name, without any declaration of trust, a trust arises with respect to such property in favor of the cestui que trust or other beneficiary."

A constructive trust arises whenever another's property has been wrongfully appropriated and converted into a different form. Hand v. Errington, Tex. Com.App., 242 S.W. 722.

We must determine whether the withdrawals of company funds by Siemoneit, over and above the amounts due him for salary or other reasons, were so wrongful or fraudulent as to bring the case within the rules just stated. Several cases have been cited in the briefs involving situations more or less like the one before us, that is to say, situations where an officer of a corporation withdraws corporation funds, over and above those due him, and uses such funds either to pay his personal debts or to purchase property for himself. We shall discuss some of these cases.

Sparks v. McCraw, 112 S.C. 519, 100 S.E. 161, cited by the trustee: Sparks was the president and manager of the bankrupt corporation. He and his wife were the sole stockholders. Sparks used corporation funds to buy certain real estate. It was found by the trial court that Sparks used the corporation funds as a means to gain an advantage to himself personally, and that the creditors began to suffer while he was using such corporate funds. The trial court also found that there were unexplained losses of corporate funds. The trustee sought to impose a constructive trust on the property purchased by Sparks with corporate funds. The trial court rendered judgment declaring such a trust, and the judgment was affirmed on appeal on the ground that there was evidence to support the findings of the trial court.

Boyle v. Lewiston Trust Co., 126 Me. 74, 136 A. 292, cited by the trustee: In this case the treasurer of the bankrupt corporation had given checks on the corporation to pay the treasurer's personal debts. The trustee in bankruptcy sued to recover the amount of such payments from the creditor of the treasurer. The court, in awarding a recovery to the trustee, said that the latter was not estopped from recovering corporate funds diverted to pay debts of officers even though such payments were acquiesced in or consented to by directors or stockholders, further saying that the trustee represented the creditors of the corporation and that the latter were not estopped. The trustee in the case before us says that for the same reason he is not cut off from claiming a constructive trust by reason of the fact that the other stockholders consented to the withdrawals by Siemoneit.

Quoting from 19 C.J.S., Corporations, § 768, page 125, the trustee says: "The law does not permit the directors or officers of a corporation to give away its property except where they are the sole stockholders and no rights of creditors are impaired, and unanimous consent is given * * *." He argues that the record shows that the company was heavily indebted and was losing a great deal of money during the times Siemoneit was withdrawing large sums from the company and using them for personal purposes. The trustee also calls attention to Article 1349, Revised Civil Statutes, Vernon's Ann.Civ. St. art. 1349, which provides: "No corporation, domestic or foreign, doing business in this State, shall employ or use its

stock, means, assets or other property, directly or indirectly for any purpose whatever other than to accomplish the legitimate business of its creation, or those purposes otherwise permitted by law."

Whitfield v. Kern, 120 N.J.Eq. 115, 184 A. 333, 336, cited by the trustee: Moneys had been paid to the officers of a corporation, over and above any amounts due them. The trustee in bankruptcy sued to recover such moneys, and to charge certain officers of the corporation with wrongfully paying the money out. One defense was that all the stockholders had ratified such payments. As to this, the court said: "If the corporation owes no debts, if the corporation has no liabilities to any one but its stockholders, the stockholders collectively may forgive and waive the enforcement of any and all liabilities due to the corporation since none but they are concerned.

"Not so, however, if the corporation owes debts to creditors. In that case the stockholders cannot forgive the debts due to the corporation, leaving its creditors unpaid, any more than they would have the right to take the corporation's money out of its bank account and divide it up amongst themselves."

When the entire opinion is read it appears that the real basis for the decision of the court was that there had been no attempt on the part of the stockholders to waive the claim against the officers until after the company had gone into bankruptcy, that the claim against the officers had passed to the trustee, and that it was no longer within the right of the stockholders to forgive the debt.

Hall v. Crawford & Delpheiis, Tex.Civ. App., 11 S.W.2d 804, 807, writ dismissed, cited by Siemoneit: Anderson was the president of a corporation and owned all the stock except a few shares which had been formally issued to his wife and to a clerk. He issued certain checks on the corporation in payment of debts he owed. The assignee for the benefit of creditors sued the recipient of these checks for the amount of them. The contention of the assignee was that Anderson misapplied the corporation's funds, and that his personal creditor to whom the funds were paid acquired such funds with notice, and acquired them, therefore, in trust. At the outset of its opinion the court declared that every case of such character must be decided in the light of its individual status and peculiar incidents. It declared that Anderson's custom of giving corporation checks direct to his creditors was in pursuance of a method he had followed in drawing his salary. Somewhat like Siemoneit did in this case, Anderson would issue corporation checks for his personal use and charge himself therewith on the books of the corporation, and would credit himself with the salary due him. Although it is said in the opinion that at most times his account was in excess of the amount due him as salary, there is nothing in the opinion to indicate that the withdrawals were anything like those found in the present case. The court declared that it was believed, in the special circumstances, that the trial court did not err in denying the assignee a recovery from Anderson's creditor to whom the corporation's checks had been given. The court noted that the stockholders had acquiesced in the practice followed by Anderson, and said that the assignee had no greater rights than the corporation or its stockholders. The court further said that there was no embezzlement or secret withdrawal of the corporation funds, that there was no effort made to intentionally defraud the corporation, and that it was admitted that the withdrawal of the funds did not bring about or influence the insolvency of the corporation. The court further declared that liability on the ground that rights of creditors had been affected could be imposed only on the theory of a prohibited transfer of property by an insolvent debtor to hinder, delay and defraud creditors, and that the facts showed conclusively that at the times of the payments in question the corporation had assets ample to pay existing liabilities. Said the court, "Consequently the acquiescence or assent of the sole stockholders and officers to the withdrawal of the funds in suit did not in fact operate to impair rights of creditors." The court cited Watts v. Gordon, 127 Tenn. 96, 153 S.W. 483; Sweet v. Lang, 8 Cir., 14 F.2d 762; and Little v. Garabrant, 90 Hun. 404, 35 N.Y.S. 689.

656

Watts v. Gordon, supra, is also cited by Siemoneit. There moneys were paid to an officer with the consent of all the stockholders, over and above any amount due him for salary or otherwise. The trustee sought, among other things, to impress a lien on a policy of life insurance, because corporate funds were used to pay the premiums. A recovery was denied to the trustee on the ground that all of the stockholders had agreed to the payment of corporate funds to the officer in question at a time when the corporation was solvent. The court declared that there could be no trust where there was no real misappropriation of the corporate funds, and where the party whose money was used agreed to the use, and further said [127 Tenn. 96, 153 S.W. 485], "This brings us back to the view, previously announced in this opinion, that where all of the real stockholders and a majority of the directors agree to a particular appropriation of the funds of the corporation, and that appropriation leaves the corporation still solvent, no one can complain."

A similar holding is found in Sweet v. Lang, supra, also cited by Siemoneit.

Were the withdrawals so wrongful or fraudulent as to warrant the erection of a constructive trust? If wrongful, as against whom were the withdrawals wrongful? They were not wrongful as against the other stockholders, because it is stipulated that they consented to the withdrawals. Were they wrongful as against the creditors in whose behalf, at least in part, the trustee acts in handling the estate of the bankrupt corporation? Although the trustee presents much argument about the debts of the corporation, and the operating losses, and the size of the withdrawals, we do not construe the pleadings and proof as indicating an attempt on the part of the trustee to show that the corporation was insolvent at the times of the withdrawals. The debit balance against Siemoneit was near $28,000 at the end of 1942, and did not go below that figure from then until the company went into bankruptcy, when the balance was about $30,000. It may be said, therefore, that the excessive withdrawals occurred, for the most part, more than three years before the company ceased to do business. There is evidence sufficient to warrant a finding that the blow that put the company into bankruptcy was a disaster to an oil well which it was drilling. Siemoneit testified that the expenditures of money on the Rivercrest property had nothing to do with bringing about the bankruptcy proceedings. As stated early in the opinion, the trial court rendered judgment in favor of Siemoneit, and by implication found in his favor on disputed issues of fact in such way as would support the judgment.

Siemoneit testified that he made certain payments of money to the corporation with the direction to the treasurer of the corporation that the payments be applied to the disbursements which had been made on the Rivercrest property. Other evidence was offered to show that the treasurer agreed to such application of the payments. The trustee vigorously argues that the record refutes any such notion of application of payments on Siemoneit's indebtedness to the company, but we can find no good ground for holding that there was not at least such a conflict in the evidence as would have warranted a finding either way on the issue. Under some circumstances a constructive trust may be imposed on property purchased with corporation funds, even though the officer repays the money to the corporation. But it is not believed that we have such a case here. It is conceded that Siemoneit made the down payment with money to which he was entitled. Therefore, he then acquired both the legal and equitable title to the property, subject only to the outstanding vendor's lien. If he thereafter used corporation funds in improving or paying for the property, it seems clear that a trust would be erected only to the extent of the corporation funds so used. If such funds were repaid, there would be left no equitable ground for declaring a trust in this kind of situation.

It is our opinion that the evidence is sufficient to support the judgment of the trial court denying the trustee a recovery.

The United States of America filed a plea in intervention in the case, alleging

that certain taxes payable to the United States had been assessed against Siemoneit Drilling Co., part being designated as withholding taxes, part as victory taxes, and part as taxes assessed under the Federal Insurance Contributions Act, 26 U.S.C.A. § 1400 et seq. The total of said unpaid taxes amounted to several thousand dollars. It was alleged in effect that by reason of the failure of Siemoneit as president and of his wife as vice-president of the company, to pay the withholding taxes which had been withheld or should have been withheld from the employees of the company, each of them was liable for penalties equal to one hundred per cent of such taxes, amounting to the total sum of $9,267.13. It was further alleged that Siemoneit and Mrs. Siemoneit were each liable for a one hundred per cent penalty for not paying the federal insurance contributions taxes, in the total sum of $982.03. It was alleged that the United States was entitled to judgment against both Siemoneit and Mrs. Siemoneit for the amount of such penalties, and was entitled to a lien on the tracts of land referred to earlier in this opinion.

The trial court found in favor of Mrs. Siemoneit on the suit against her for penalties, and no complaint is made of such finding on this appeal.

The trial court found that the United States was entitled to judgment against Siemoneit for the penalties above mentioned, with legal interest thereon, and further found that the United States was entitled to a lien on the land in question. Siemoneit and Mrs. Siemoneit both appeal from this portion of the judgment.

As is declared in its brief, the federal statute upon which the intervention of the United States is based is embodied in Sec. 2707 of the Internal Revenue Code, 26 U.S.C.A. § 2707:

"(a) Any person who willfully fails to pay, collect, or truthfully account for and pay over the tax imposed by section 2700 (a), or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty of the amount of the tax evaded, or not paid, collected, or accounted for and paid over, to be assessed and collected in the same manner as taxes are assessed and collected. No penalty shall be assessed under this subsection for any offense for which a penalty may be assessed under authority of section 3612.

"(b) Any person required under this subchapter to pay any tax, or required by law or regulations made under authority thereof to make a return, keep any records, or supply any information, for the purposes of the computation, assessment, or collection of any tax imposed by this subchapter who willfully fails to pay such tax, make such returns, keep such records, or supply such information, at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be guilty of a misdemeanor and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than one year, or both, together with the costs of prosecution.

"(c) Any person required under this subchapter to collect, account for and pay over any tax imposed by this subchapter, who willfully fails to collect or truthfully account for and pay over such tax, and any person who willfully attempts in any manner to evade or defeat any tax imposed by this subchapter or the payment thereof, shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than five years, or both, together with the costs of prosecution.

"(d) The term 'person' as used in this section includes an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs."

By reference, Chapter 9 of the Internal Revenue Code, 26 U.S.C.A. § 1400 et seq., makes the same penalties applicable to taxes imposed under the Federal Insurance Contributions Act. Subchapter D of Chapter 9, 26 U.S.C.A. § 1621 et seq., makes the penalties aforesaid applicable to withholding taxes.

The trial court filed findings of fact and conclusions of law relating to this phase of the suit. The findings of fact are in substance: (1) At all times after April, 1943, the company was embarrassed financially. Its operations in the interval between April of 1943 and March of 1945 required that it borrow money and liquidate capital assets continually. Siemoneit and E. R. Land, the executive officers of the company, deemed it prudent to delay payment of the federal taxes after same were due in order to conserve funds for operations. If the operations had been successful, the corporation would have recovered from its embarrassment and would have paid the taxes owing to the government. (2) Siemoneit had no fraudulent motive nor intent to defraud the government of its revenue in failing to cause payment of said taxes; but he did deliberately and intentionally fail to cause payment of the taxes when they were due. (3) Mrs. Siemoneit had neither duty nor authority to pay said taxes for the company. The conclusions of law read as follows:

"1. Liability to the civil penalty authorized by Section 2707(a), 26 U.S.C.A. does not depend upon the same criminal intent as required for conviction under Section 2707(b) or (c), but arises when there is a deliberate, intentional failure to pay taxes when due.

"II. C. J. Siemoneit is therefore liable to the Government for the penalties assessed by the Commissioner of Internal Revenue.

"III. The defendant, Lelia Mae Siemoneit, is not personally liable to the penalties assessed by the Commissioner of Internal. Revenue and adjudged herein against her husband.

"IV. The indivisible homestead estate of Lelia Mae Siemoneit is nevertheless subject to a lien for such penalties so assessed and adjudged against her husband."

Under the first point of error Siemoneit argues that the term "wilfully" as used in the quoted statutes means "with bad purpose" or "with evil motive."

In 47 C.J.S., Internal Revenue, § 988, beginning at page 1245, under the general title "Internal Revenue," it is pointed out that violations of the internal revenue law are punishable by civil and criminal sanctions. On page 1246 it is said that in statutory offenses a guilty intent is not necessarily an ingredient, but that where the law contains the words "with intent to evade" the intent is material and of the essence of the offense. It is further said that the word "wilfully," in the ordinary sense in which it is used in statutes, means not voluntarily, but with a bad purpose; but that it is a word of many meanings and that its construction is often influenced by the context. On page 1249, section 992, it is said that in the statute providing that any person who wilfully fails to file an income tax return is guilty of a misdeameanor, a mere voluntary and purposeful failure to make a return may meet the test of "wilfullness," but that in the statute making it a misdemeanor to "wilfully" fail to pay the tax, the term means more than in the statute relating to failure to make a return, and requires more than a mere voluntary and purposeful failure to pay the tax. There must be included some element of evil motive and want of justification in view of all the financial circumstances of the taxpayer.

It is to be remembered here that Siemoneit was not the tax payer—it was not he who owed the tax to the government. The government is here undertaking to impose on him a civil sanction because he as an officer of the corporation which did owe the tax failed to cause the corporation to pay the tax when it was due. Under the law, if the circumstances had warranted, the penalty might have been assessed against both Mr. and Mrs. Siemoneit, even though the tax might eventually be paid by the trustee. Fines and penalties are not necessarily the same, but, in cases like the one before us, in either event it is a financial penalty imposed for a violation of the laws respecting internal revenue. The penalty imposed by the trial court here was a heavy one, amounting with interest to more than $10,000. There is every reason to say that the law providing for such a penalty should receive a strict construction just as it would receive if the penalty were imposed under a criminal law. In fact, it is doubtful under the facts of this case if a

fine of $10,000 would have been assessed by any court had Siemoneit been prosecuted under the provisions of the act which impose criminal penalties.

In Felton v. United States, 96 U.S. 699, 24 L.Ed. 875, the revenue law under consideration imposed certain penalties if the distiller of spirits should "knowingly or wilfully" omit, neglect or refuse to do anything required by law in conducting his business. We quote from the opinion of the court:

"Doing or omitting to do a thing knowingly and wilfully implies not only a knowledge of the thing, but a determination with a bad intent to do it, or to omit doing it. 'The word "wilfully"'", says Chief Justice Shaw, 'in the ordinary sense in which it is used in statutes means not merely "voluntary", but with a bad purpose.' Commonwealth v. Kneeland, 20 Pick., Mass., 206, 220. 'It is frequently understood', says Bishop, 'as signifying an evil intent without justifiable excuse.'

"* * * All punitive legislation contemplates some relation between guilt and punishment. To inflict the latter where the former does not exist would shock the sense of justice of everyone.

"* * * The object. of the law in all its stringent provisions is to prevent fraud upon the revenue and to secure the tax levied * * * The parties * * * acted in good faith for the purpose of saving the property for themselves and the government * * * If a purpose to evade the laws be an element in the offense charged, the defendants would not, under the evidence presented by the record, be rightfully subjected to the penalty prescribed, and the forfeiture of their property."

■ Similar holdings are found in Potter v. United States, 155 U.S. 438, 15 S.Ct. 144, 39 L.Ed. 214; and Spies v. United States, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418. The two cases last cited involved criminal penalties, but, as we have said, we believe that the severity of the civil penalty here involved requires that. we give the terms of that portion of the statute the same strict construction that we would give the portions of the statute which provide for criminal penalties. It is to be noted that the portions of the statute providing for criminal penalties and those providing for civil penalties contain the same wording concerning wilful failure to pay the tax. It is familiar law that where the same expression appears several times in a statute it will ordinarily be given the same meaning throughout the statute. We think that the following cases support the views we have just expressed: One 1941 Buick Sedan v. United States, 10 Cir., 158 F.2d 445; Rainbow Dyeing & Cleaning Co. v. Bowles, 80 U.S.App.D.C. 137, 150 F.2d 273; Carson Naval Stores Co. v. United States, D.C., 29 F.Supp. 818; Thompson v. Hays, 8 Cir., 11 F.2d 244; Cascade County, Montana v. Penwell, Collector, D.C., 67 F.Supp. 253.

The cases cited by the government do not, in our opinion, quite reach the problem we have here, and are not as directly in point as are those cited above.

■ Under the findings of fact made by the trial judge, which we think have some support in the evidence, it is our opinion that Siemoneit is not liable for the penalties sought to be imposed upon him.

Mr. and Mrs. Siemoneit urgently contend that in no event is the government entitled to a lien on the land in question as against their claim of homestead. In view of the holding above announced, we do not get to this question.

The judgment of the trial court, in so far as it awards a recovery in favor of the United States against Siemoneit for the penalties just discussed, and in so far as it awards the United States a foreclosure of lien against the land in question, is reversed, and judgment is here rendered that the United States take nothing by its suit against Siemoneit or Mrs. Siemoneit. In all other respects the judgment of the trial court is affirmed.

Reversed and rendered in part, affirmed in part.